UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ERIC R. HOPSON,

        Petitioner,

                                            Case No. 15-cv-11582

v.

                                            HON. MARK A. GOLDSMITH

DUNCAN MACLAREN,

        Respondent.

_____/

**OPINION & ORDER
(1) DENYING PETITION FOR WRIT OF HABEAS CORPUS (Dkt. 1),
(2) GRANTING IN PART A CERTIFICATE OF APPEALABILITY, AND
(3) GRANTING LEAVE TO APPEAL IN FORMA PAUPERIS**

Petitioner Eric R. Hopson ("Petitioner"), a state prisoner at the Chippewa Correctional Facility in Kincheloe, Michigan, filed a pro se petition for writ of habeas corpus (Dkt. 1) pursuant to 28 U.S.C. § 2254. The petition challenges Petitioner's Genesee County convictions for second-degree murder, armed robbery, and two firearm offenses on grounds that the evidence was insufficient to sustain his murder and firearm convictions, trial counsel was ineffective, and the sentencing guidelines were incorrectly scored. For the reasons stated below, the Court denies the petition for writ of habeas corpus, grants a partial certificate of appealability, and grants leave to appeal in forma pauperis.

## I. BACKGROUND

### A. The Trial and Sentence

Petitioner was charged with first-degree murder, two counts of armed robbery, one count of felon in possession of a firearm, and one count of possession of a firearm during the

commission of, or attempt to commit, a felony (felony-firearm). He and his co-defendant, Cedrick Beck, were tried jointly, but before separate juries, in Genesee County Circuit Court. The state appellate court provided the following brief overview of the facts:

> Defendants' convictions arise from their involvement in the robbery of two store employees, Peter Farah and Gregory Peterson, at a market in the city of Flint on April 9, 2009. Farah was shot during the offense and later died from his injuries. The store contained a Plexiglas partition that separated the cashier area from the main shopping area. While Farah and Peterson were both inside the enclosed cashier area, defendant Beck kicked open the door to the enclosed area, shot Farah, and ordered Peterson to lie down on the floor. Defendant Hopson also entered the cashier area and forced Peterson to remove his clothing. Both defendants took money before leaving the store.

People v. Hopson, No. 301054, 2013 WL 3239706, at *1 (Mich. Ct. App. June 27, 2013).

Officer Brett Small of the Flint Police Department responded to the market about 1:52 p.m. on April 9, 2009, after hearing about a robbery in progress and a possible shooting inside the store. The first person he met was Ivan Dye, who advised him that the victim was inside the store. Upon entering the market, Officer Small saw the victim lying unresponsive behind the counter in a pool of blood with a gunshot wound to his leg. Another gentleman, Gregory Peterson, identified himself as an employee of the store and said that two young men had come into the store and kicked the door behind the counter. One of the two men pointed a shotgun at Peterson and ordered him to the ground. After Peterson heard a gunshot, the men fled from the store. 8/17/10 Trial Tr. at 130-148, PageID.1015-1033 (Dkt. 7-12).

Retired Flint police officer Kris Blinkilde also responded to the scene. He briefly interviewed Ivan Dye, who informed Blinkilde that as he was walking toward the store, he saw a young black male wearing a dark jacket with fur around the hood run across the parking lot. Dye explained that, as he walked inside the store, a slightly older man wearing a dark jacket pushed past him. He saw a nude man behind the counter and when he asked the man what had

happened, the man said, "We've just been robbed." The man told him there were no phones there. So, Dye went to his girlfriend's home to call the police. When Dye returned to the store, the police were there. Id. at 192-197, PageID.1077-1082. According to Officer John Joseph, Farah was pronounced dead at 2:20 p.m. the same day. 8/18/10 Trial Tr. at 25, PageID.1119 (Dkt. 7-13).

Ivan Dye testified that, about 1:45 p.m. on April 9, 2009, a black male wearing a black hoodie came out of the Dayton Market as Dye was exiting his vehicle. He did not see the man's face. He proceeded to enter the building and saw a male come from behind the counter where a fake gun was usually kept. The man was wearing a black hoodie and black pants with yellow writing on the back pockets. The man tucked something into his waistband and walked past Dye. He did not see the man's face, and when he called out Pete's name, there was no response. However, a half-naked black male who worked in the store stood up and said, "Are they gone? We just got robbed." The employee said that Pete was in the back, lying in a pool of blood. Dye looked out the door and saw two men running away. He then went home and called the police. When he returned to the store, he informed an officer that the store had been robbed and that Pete had been shot. An officer brought him to the police station where a female officer asked him several questions. Id. at 78-94, 122-127, 133-140, PageID.1172-1188, 1216-1221, 1227-1234.

Sergeant Kenneth Engel of the Flint Police Department arrived at the scene between 2:00 and 3:00 p.m. on April 9, 2009. He was directed to a lady named Watson who gave him the names of possible suspects. Engel then gave Beck and Petitioner's names to Sergeant Coon. Engel stayed at the scene and assisted employees of the Michigan State Police Crime Lab who processed the entire scene. He pointed out to employees of the State Police Department that the

door to the counter area had been kicked in.  When he left the scene of the crime, he went to the trailer where someone had said Beck was staying, but Beck was not there.  Id. at 146-178, 184-185, PageID.1240-1272, 1278-1279.

Sergeant Jennifer Leigh Golden responded to the scene between 2:15 and 2:30 p.m. on April 9.  She helped to secure the scene and also went to Ivan Dye's residence to make sure that no one at that address was involved in the crime.  Back at the store, she and other officers watched videos of the crime and then went to a residence at 2309 Dupont Street in an attempt to locate the two suspects, Cedrick Beck and Eric Hopson.  No one was inside the residence, but inside a utility trailer on a vacant lot south of 2309 Dupont, she found a live twelve-gauge shotgun shell, a torn one-dollar bill with suspected blood on it, a navy blue jacket with fur around the hood, and two dark-colored hooded sweatshirts.  Id. at 194-217, PageID.1288-1311.

In the surveillance video that Sergeant Golden watched prior to the search of the trailer, she saw a suspect retrieve a shotgun from beneath his clothing before he shot the store clerk. She noticed that the second suspect had entered the store wearing a dark-colored jacket with fur around the hood.  In light of the depiction of the crime in the videotape, the items found at the trailer raised suspicion even though neither Beck nor Petitioner was there.  Id. at 216-218, PageID.1310-1312.

Later that night or early the next morning, Sergeant Golden once again played the videotape of the crime for the detectives and, after obtaining search warrants, she and other officers returned to the residences at 2309 Dupont and 2313 Dupont Street and the nearby trailer. In addition to the items found at the trailer, she collected five one-dollar bills from 2313 Dupont Street.  One of those bills had a red substance on it, but the red was similar to the paint on the

utility trailer in the driveway of the residence.  The shotgun used in the crime was never located. Id. at 220-245, PageID.1314-1339.

Tracy Watson testified that she was related to both Petitioner and Beck.  On April 9, 2009, she saw the yellow police tape at the Dayton Market on Dupont Street.  About twenty minutes later, her niece told her something that she thought the police should know.  She subsequently informed an officer whom she knew and Sergeant Ken Engel that her cousin Cedrick Beck was involved in the crime.  At no point did she mention Petitioner to the officers. A couple of days later, she gave a similar statement to Sergeant Coon at the police station. 8/19/10 Trial Tr. at 43-80, PageID.1385-1422 (Dkt. 7-14).

About 6:45 p.m. on April 9, 2009, Officer Esther Campbell received a telephone call from Sergeant Golden, asking her to respond to Dayton and Dupont Streets where a shooting had occurred earlier that day.  She learned the suspects' names from Sergeant Golden at the crime scene.  She then acquired photographs of Petitioner and Beck through the police department's LIEN system.  Beck had a distinctive tattoo with the word "Flint" on one wrist, and he had letters tattooed on the tips of his fingers.  She and another officer went to the Flint bus station because the police had received information that the suspects may have gone there.  The officers did not locate either Petitioner or Beck at the station.  They subsequently received information that the suspects might be at a house or trailer at 2309 Dupont Street, but the suspects were not there either.  About 8:45 p.m., however, she overheard radio traffic from Sergeant Terry Coon that he was in a police chase with a homicide suspect at the Richfield Court Apartments.  She responded to the apartment complex and began to canvass Building H with Sergeants Coon and Birnie. They were given permission to search an apartment where she found and arrested Beck.  He had

distinctive tattoos on his wrist and finger tips, and his pants had a multicolored pattern on the back pockets. Id. at 82-99, PageID.1424-1441.

Police officer Mark Peck transported Beck to the police station where he took Beck's clothing. He noticed a suspected blood stain on the inside of Beck's front pants pocket. Id. at 123-133, PageID.1465-1475.

Dr. Melanie Trapani testified as an expert in DNA analysis. She said that DNA swabs taken from the doorknob between the clerk's area and the public area of the market were consistent with a mixture of three individuals, including Petitioner, Beck, and Farah. A stain on the back of a blue coat was identified as originating from Farah, and the DNA profile obtained from the inside sleeve cuffs and zipper on the blue coat was identified as originating from Petitioner. The likelihood that the same DNA profile found on the cuffs and zipper of the jacket would appear in someone else was one in 722 trillion unrelated individuals. 8/20/10 Trial Tr. at 12, 32-35, 44, 84, 88-89, PageID.1504, 1524-1527, 1536, 1576, 1580-1581 (Dkt. 7-15).

Dr. Brian Hunter performed the autopsy on Farah. He testified that the cause of death was a shotgun wound to the legs and that the manner of death was homicide. The bullet entered the right thigh, exited that thigh, and then entered the left thigh. The complete transection of the main arteries and veins in the legs led to massive blood loss. Id. at 108-126, PageID.1600-1618.

Keith Lamont was the trace evidence examiner and an expert in footwear analysis and footwear identification. According to him, the gelatin lift of a footprint submitted to him matched the right shoe that Beck was wearing at the time of his arrest. Id. at 140-171, PageID.1632-1663.

Lieutenant Collin Birnie testified about tips that the police received, Beck's subsequent arrest, and Petitioner's arrest by a fugitive team on April 10, 2009. His investigation led him to

believe that there was only one shooter.  8/24/10 Trial Tr. at 7-38, PageID.1681-1712 (Dkt. 7-16).

Tellis Smith testified that, between 2:30 and 3:00 p.m. on April 9, 2009, his friend Nigel told him that a guy wanted a ride across town.  The guy, whom Smith later learned was Beck, told him about a robbery he had committed and how he had used a shotgun to shoot a man in the leg.  Beck explained to Smith that he went to the store because someone had informed him there was money in the store.  Beck said there was something wrong with his gun and it went off.  He later hid the gun under the trailer.  Beck said that his partner was with him at the time, but he did not mention the person's name.  Beck denied having any intent to kill the man, and when the news came on, Beck was shocked to hear that the victim had died.  Between 6:00 and 7:00 p.m., Smith drove Beck to some apartments.  Smith then returned home and called the police.  He informed Sergeant Coon where to find Beck.  Id. at 76-115, PageID.1750-1789.

Nigel Bolds testified that Tellis Smith was a neighbor and mentor to him, and that on April 9, 2009, he was standing in Smith's front yard when Beck walked up to him and offered him fifty dollars to take him around the corner.  Bolds took Beck inside Smith's home where he overheard Beck and Smith's conversation.  Beck said that he had just stolen something or robbed somebody.  After they heard the news, they learned that the victim had died, and they were shocked.  Beck never mentioned Petitioner, and Bolds eventually left the house.  Sergeant Coon later came over and talked to him. Id. at 148-164, PageID.1822-1838.

David Perez was living in the Richfield Court Apartments on April 9, 2009, when his friend Cedrick Beck came over.   Beck briefly left the apartment a few times.  On his third return, Beck looked like someone had been chasing him, but he did not want to talk to Bolds and

he did not mention shooting or robbing anyone. So, Bolds left Beck in a bedroom. Later, the police arrived and found Beck in the bedroom. Id. at 167-205, PageID.1841-1879.

Detective Sergeant Ryan Larrison of the Michigan State Police went to the crime scene and located part of a shotgun shell that was consistent with a twelve-gauge firearm. Larrison stated that firearms were designed to fire when one pulls the trigger and that every firearm he had seen required pulling the trigger to make the gun fire. 8/25/10 Trial Tr. at 14-27, 49-50, PageID.1896-1909, 1931-1932 (Dkt. 7-17).

Nikita Johnson knew both of the defendants. He testified that, on April 9, 2009, he saw Petitioner at a construction trailer near 2313 Dupont Street where Beck was living at the time. 8/26/17 Trial Tr. at 33, PageID.2128 (Dkt. 7-18).

Gregory Peterson described what happened while he was working at the Dayton Market on April 9, 2009. Someone came in the market around 1:30 or 2:00 p.m. that day and kicked in the door to the back area of the market. He saw a shotgun and was told to lie down. He did not see the man's face because the man had a hood over his head. The man asked Pete for money. Someone else came in and told the guy who kicked in the door that somebody was walking up to the market. He heard one gunshot and noticed that Pete had been shot. At some point Peterson was told to take off his clothes. He could see the men moving around, and he heard the men taking money from the cash register. After he heard the door slam, he got up and called the 911 operator. A customer arrived and asked about Pete because the customer had seen some guys running away from the store. Id. at 60-124, PageID.2155-2219.

Sergeant Terry Coon of the Flint Police Department was the officer in charge of the case. He summarized the efforts made during the investigation of the case, and he provided a

commentary as a videotape of the crime was played for the jury.  <u>Id</u>. at 129-180, PageID.2224-2275.

Sergeant Coon also interrogated Petitioner.  At first, Petitioner denied any involvement in the crime.  After Sergeant Coon confronted Petitioner with what he had seen on the videotape, Petitioner admitted that he had been in the store.  Petitioner also admitted taking some money from the store and assisting Beck in the crime.  Among other things, Petitioner stated that, when Beck entered the store, he did not know Beck was going to rob the store.  He thought Beck was going to wait, and entered the store when he heard someone yelling.  He told the man inside to get naked because he was scared.  Then, he grabbed a bunch of lottery paper and $20 and ran outside.  As he was taking off his coat, Beck ran up to him and went into the shed.  Petitioner threw his coat down and left to pick up his baby's mother.  Beck later called him and said that he was on his way to Ohio.  That was the last he heard from Beck.  "Dre" was one of the people who set it up.  8/27/10 Trial Tr. at 7-24, 36-38, PageID.2289-2306, PageID.2318-2320 (Dkt. 7-19).  Petitioner mentioned to Sergeant Coon several times that the incident was supposed to be an inside job, and he denied knowing that there was going to be a robbery.  <u>Id</u>. at 39-46, PageID.2321-2328.

Petitioner did not testify or present any witnesses.  His defense was that he participated in the armed robbery, but that he did not intend to shoot Farah and he did not know that Beck planned to shoot Farah.  Defense counsel also argued to the jury that Petitioner acted under duress because he was afraid of Beck and thought that Beck was going to shoot him if he did not participate in the crime.  8/31/10 Trial Tr. at 87, 102-103, 109-113, PageID.2510, 2525-2526, 2532-2536 (Dkt. 7-20).

On September 2, 2010, the jury found Petitioner guilty of second-degree murder, Mich. Comp. Laws § 750.317, as a lesser-included offense to first-degree murder, two counts of armed robbery, Mich. Comp. Laws § 750.529, felon in possession of a firearm, Mich. Comp. Laws § 750.224f, and felony firearm, Mich. Comp. Laws § 750.227b. 9/2/10 Trial Tr. at 3-4, PageID.2578-2579 (Dkt. 7-21). On October 14, 2010, the trial court sentenced Petitioner as a habitual offender to two years in prison for the felony-firearm conviction, followed by concurrent terms of fifty-six years, three months to ninety-three years, nine months for the murder conviction; thirty-five years, seven months to seventy-five years for each robbery conviction; and four years, nine months to ten years for the felon-in-possession conviction. 10/14/10 Sentence Tr. at 40-42, PageID.2625-2627 (Dkt. 7-22).

**B. The Post-Conviction Proceedings, Habeas Petition, and Responsive Pleading**

Petitioner filed a motion for new trial in which he claimed that there was insufficient evidence at trial to support his felon-in-possession conviction, and defense counsel was ineffective for failing to preclude evidence of Petitioner's felony record. On May 9, 2011, the trial court held a hearing on the motion and denied it. 5/9/11 Mot. Hr'g at 3-11, PageID.475-483 (Dkt. 7-7).

Petitioner raised his habeas claims in an appeal of right. The Michigan Court of Appeals affirmed his convictions in an unpublished, per curiam opinion. See Hopson, 2013 WL 3239706. On March 28, 2014, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues presented to it. See People v. Hopson, 843 N.W.2d 752 (Mich. 2014).

On May 1, 2015, Petitioner filed his habeas corpus petition in this Court, raising the following seven claims:

I. The evidence submitted at Petitioner Hopson's trial was insufficient to convict him of aiding and abetting second-degree murder;

II. Petitioner was denied due process of law where he was convicted of aiding and abetting a firearm where there was no evidence of the same.

III. Petitioner was denied due process of law when he was convicted of aiding and abetting a felon in possession of a firearm.

IV. Petitioner was deprived of effective assistance of counsel where counsel failed to move to quash the charge of felon in possession of a firearm.

V. Petitioner was denied due process of law where the state court assessed him 50 points for OV-6 for a death committed while committing or attempting to commit robbery where the court must score this variable consistent with the jury verdict and where the jury acquitted defendant of committing murder in the perpetration of, or attempt to perpetrate, a robbery.

VI. Petitioner was denied due process of law where the state court assessed him 50 points for OV-7 for treating a victim with "sadism, torture, or excessive brutality or conduct designed to substantially increase the fear and anxiety a victim suffered during the offense" based on someone "arguably" kicking victim Farah once after he was shot and requiring Peterson to strip after the shooting.

VII. Petitioner was denied due process of law where the state court assessed him 15 points for OV-10 for predatory conduct where no vulnerable victims were involved.

Respondent Duncan MacLaren urges the Court to deny the petition on grounds that Petitioner's sentencing claims are not cognizable on habeas review, that the Court may deny relief on claim three under the concurrent sentencing doctrine, and that the state court reasonably adjudicated all of Petitioner's claims. Resp't Answer to Pet. at i-iii, PageID.32-34 (Dkt. 6).

## II. STANDARD OF REVIEW

Title 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. Williams v. Taylor, 529 U.S. 362, 405-406 (2000). An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." Id. at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411.

The Supreme Court has explained that a "federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). Thus, the AEDPA "imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of

the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010). A "state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. at 102. Furthermore, pursuant to section 2254(d), "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. Id. Habeas relief is not appropriate unless each ground that supported the state-court's decision is examined and found to be unreasonable under the AEDPA. See Wetzel v. Lambert, 520 U.S. 520, 525 (2012).

"If this standard is difficult to meet, that is because it was meant to be." Harrington, 562 U.S. at 102. Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not completely bar federal courts from re-litigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the Supreme Court's precedents. Id. Indeed, section 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." Id. Thus, a "readiness to attribute error [to a state court] is inconsistent with the presumption that state courts know and follow the law." Woodford v. Viscotti, 537 U.S. 19, 24 (2002). Therefore, in order to obtain habeas relief in federal courts, a state prisoner is required to show that the state-court's rejection of his claim

"was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 562 U.S. at 103.

A state-court's factual determinations are presumed correct on federal habeas review. See 28 U.S.C. § 2254(e)(1). A habeas petitioner may rebut this presumption of correctness only with clear and convincing evidence. Id.; Warren v. Smith, 161 F.3d 358, 360-61 (6th Cir. 1998). Moreover, habeas review is "limited to the record that was before the state court." Cullen v. Pinholster, 563 U.S. 170, 181 (2011).

### III. ANALYSIS

**A. Claims One, Two, and Three: Sufficiency of the Evidence**

The first three habeas claims challenge the sufficiency of the evidence adduced at trial. Petitioner asserts that the evidence was insufficient to support his murder and firearm convictions. The Michigan Court of Appeals adjudicated each of Petitioner's challenges to the sufficiency of the evidence and rejected the claims on the merits.

**1. Clearly Established Federal Law**

The United States Supreme Court has held "that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). Following Winship, the critical inquiry on review of a challenge to the sufficiency of the evidence supporting a criminal conviction is

> whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to

resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

Jackson v. Virginia, 443 U.S. 307, 318-319 (1979) (internal citations and footnote omitted) (emphases in original).

The Supreme Court has "made clear that Jackson claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." Coleman v. Johnson, 566 U.S. 650, 651 (2012). First, it is the responsibility of the jury to decide what conclusions should be drawn from the evidence admitted at trial. Id. (quoting Cavazos v. Smith, 565 U.S. 1, 2 (2011)). "And second, on habeas review, 'a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.' " Id. (quoting Smith, 565 U.S. at 2); see also Tanner v. Yukins, 867 F.3d 661, 672 (6th Cir. 2017) (explaining that "two layers of deference apply [to a sufficiency-of-the-evidence claim], one to the jury['s] verdict, and one to the state appellate court"). The Jackson standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law," Jackson, 443 U.S. at 324 n.16, but a reviewing court does "not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury." Tanner, 867 F.3d at 672.

### 2. The Murder Conviction

Petitioner alleges that the evidence submitted at his trial was insufficient to convict him of second-degree murder. The Michigan Court of Appeals disagreed with Petitioner and concluded that the evidence was sufficient to support the murder conviction on an aiding-and-abetting theory.

In Michigan,

> [t]he elements of second-degree murder are: (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse. People v. Bailey, 451 Mich. 657, 669, 549 N.W.2d 325 (1996).
>
> Malice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm. People v. Aaron, 409 Mich. 672, 728, 299 N.W.2d 304 (1980).

People v. Goecke, 579 N.W.2d 868, 878 (Mich. 1998).

> The facts and circumstances of the killing may give rise to an inference of malice. A jury may infer malice from evidence that the defendant intentionally set in motion a force likely to cause death or great bodily harm. Malice may also be inferred from the use of a deadly weapon.

People v. Carines, 597 N.W.2d 130, 136 (Mich. 1999) (citations omitted). Thus, "[o]ne can possess malice as defined by Michigan law simply by acting with disregard for the 'life-endangering consequences' of one's actions." Stewart v. Wolfenbarger, 595 F.3d 647, 658 (6th Cir. 2010) (quoting People v. Aldrich, 631 N.W.2d 67, 80 (Mich. Ct. App. 2001)).

The evidence at trial established that Beck shot and killed Peter Farah, and Petitioner admitted in his statement to Sergeant Coon that he participated in the robbery at the market. The only dispute here is whether Petitioner aided and abetted Beck in murdering Farah.

> "Aiding and abetting" describes all forms of assistance rendered to the perpetrator of a crime and comprehends all words or deeds that might support, encourage, or incite the commission of a crime. . . . To support a finding that a defendant aided and abetted a crime, the prosecutor must show that (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid and encouragement. An aider and abettor's state of mind may be inferred from all the facts and circumstances. Factors that may be considered include a close association between the defendant and the principal, the defendant's participation in the planning or execution of the crime, and evidence of flight after the crime.

Carines, 597 N.W.2d at 135 (quoting People v. Turner, 540 N.W.2d 728, 733-734 (Mich. Ct. App. 1995)).

Petitioner concedes that he may have aided Beck in committing a robbery, but he denies aiding Beck in committing the murder. Petitioner contends that, because he did not enter the store until after Beck shot Farah, he could not have intended to commit the murder, and he could not have known that Beck intended to commit murder. Petitioner points out that Beck told Tellis Simon that Petitioner did not intend to murder Farah. 8/24/10 Trial Tr. at 106, PageID.1780. Beck also informed Simon that something was wrong with the gun, that they did not think it would fire, and that the gun went off. Beck was shocked to learn that he had killed the victim. Id. at 83-85, 105-109, 113-114, PageID.1757-1759, 1779-1783, 1787-1788. Beck, however, also admitted that he should not have gone in the store with the gun because the gun was "trigger-happy," and he did not act shocked until he learned that the victim had died. Id. at 111-114, PageID.1785-1788.

Furthermore, defense counsel conceded that Petitioner was the second man to enter the Dayton Market on April 9, 2009, 8/31/10 Trial Tr. at 103, PageID.2526, and Gregory Peterson testified that it was the second man who warned the first man during the robbery that someone was approaching the store. This suggests that, initially, Petitioner was acting as a "lookout." Additionally, as the Michigan Court of Appeals pointed out, a videotape of the crime "depict[ed] Petitioner acting in concert with defendant Beck and positioning himself in a manner that allowed him to act as defendant Beck's backup as he entered the store." Hopson, 2013 WL 3239706 at *4.

Other evidence established that Petitioner and Beck "grew up together." 8/19/10 Trial Tr. at 46, PageID.1388. The jury could have inferred from the close association between Petitioner and Beck and from the use of a large gun in the shooting that Petitioner was aware Beck possessed the gun. Although Petitioner contends that he did not enter the market until after

the shooting, an inference of malice can be appropriate even when the aider and abetter is not in the principal's presence at the time the principal committed the murder. <u>Stewart</u>, 595 F.3d at 660. After the shooting, Petitioner grabbed money and lottery papers from the store, and he was found hiding in a closet at the time of his arrest.

A rational trier of fact could have concluded from all the facts and circumstances taken in the light most favorable to the prosecution that Petitioner participated in the armed robbery with Beck in wanton and willful disregard of the likelihood that his behavior would cause death or great bodily harm. By assisting Beck in an armed robbery, he set in motion a force likely to cause death or great bodily harm. Thus, the prosecution satisfied the malice element of second-degree murder, and there was sufficient evidence to support Petitioner's murder conviction.

In addition, the state appellate court's finding – that the evidence was sufficient evidence to support Petitioner's conviction – was objectively reasonable. Although the Michigan Court of Appeals did not cite <u>Jackson</u> in its decision, its decision was not contrary to <u>Jackson</u>. Accordingly, Petitioner is not entitled to relief on the basis of his challenge to the sufficiency of the evidence supporting his murder conviction.

### 3. The Felony-Firearm and Felon-in-Possession Convictions

Petitioner alleges that there was insufficient evidence that he aided and abetted Beck in possessing a firearm during the commission of a felony. He maintains that he was outside the store when Beck pulled out the shotgun and that he provided no aid or encouragement to Beck. Petitioner also contends there was insufficient evidence that he aided and abetted a felon in possessing a firearm, because there was no evidence that Beck was a felon. The Michigan Court of Appeals disagreed with Petitioner and concluded that there was sufficient evidence to support both of Petitioner's firearm convictions.

In Michigan, "[t]he elements of felony-firearm are that the defendant possessed a firearm during the commission of, or the attempt to commit, a felony." People v. Avant, 597 N.W.2d 864, 869 (Mich. Ct. App. 1999). The essential elements of felon in possession of a firearm are: "(1) the defendant is a felon who possessed a firearm (2) before his right to do so was formally restored under MCL 28.424." People v. Bass, 893 N.W.2d 140, 158 (Mich. Ct. App. 2016), appeal denied, 901 N.W.2d 590 (Mich. 2017). Petitioner admitted to Sergeant Coon that he stole money and lottery papers from the market, and he stipulated through counsel that he was a felon who was ineligible to possess a firearm. 8/31/10 Trial Tr. at 20-21, PageID.2443-2444. Therefore, as to both firearm offenses, the question is whether Petitioner possessed a firearm during the robbery or murder.

Possession of a prohibited firearm in Michigan "is not limited to actual possession, but may include both constructive possession, and joint possession by defendants acting in concert." People v. Hill, 446 N.W.2d 140, 141 (Mich. 1989). "[A] defendant has constructive possession of a firearm if the location of the weapon is known and it is reasonably accessible to the defendant." Id. at 143.

There was no evidence at trial that Petitioner actually possessed a firearm during the robbery. Thus, the narrower issue is whether Petitioner had joint and constructive possession of the gun used during the robbery and murder at the market.

The Michigan Court of Appeals pointed out on review of Petitioner's claim that

[t]he evidence showed more than defendant Hopson's participation in stealing items from the store. Viewed in a light most favorable to the prosecution, the evidence that defendant Hopson was watching defendant Beck's back and taking control of Peterson was sufficient to establish that defendant Hopson performed acts that assisted defendant Beck in possessing the shotgun during the commission of the felonies.

Hopson, 2013 WL 3239706, at *5. The Court of Appeals went on to say that

the jury could have reasonably inferred from the evidence, particularly the surveillance video of the offense, that defendants Beck and Hopson were acting in accordance with a planned robbery. Viewed in a light most favorable to the prosecution, the evidence permitted the jury to find that defendants Beck and Hopson jointly possessed the shotgun, with defendant Beck having actual possession of the firearm and defendant Hopson having constructive possession of the weapon. The jury could reasonably infer from the defendants' concerted actions that the shotgun defendant Beck carried was reasonably accessible to defendant Hopson in the event it was needed to keep Peterson under control.

Id.

The record supports the state court's observations that Petitioner performed a supporting role during the crimes. Moreover, the gun used in the crimes was a rifle or shotgun, and even though there was some evidence that the gun was hidden inside Beck's pants when Beck entered the store, the jury could have inferred that Petitioner was aware of the gun Beck possessed because the gun was large. And because Petitioner and Beck were in close proximity to each other, the gun was accessible to Petitioner.

A rational trier of fact could have concluded from the evidence taken in the light most favorable to the prosecution that Petitioner constructively possessed the firearm during the crime. Consequently, the evidence was sufficient to support Petitioner's firearm convictions, and the state appellate court's rejection of Petitioner's claims was not contrary to Jackson. The mere existence of sufficient evidence to convict Petitioner, without regard to the credibility of witnesses, defeats his challenges to the sufficiency of the evidence. Matthews v. Abramajtys, 319 F.3d 780, 788-789 (6th Cir. 2003).

### B. Claim Four: Ineffective Assistance of Counsel

Petitioner alleges that he was deprived of effective assistance of counsel when his trial attorney failed to move to quash the felon-in-possession charge following the preliminary examination. According to Petitioner, there was no evidence that he personally or constructively

possessed a firearm, and evidence of his felony record was irrelevant and highly prejudicial. He further alleges that, because he did not testify, there was no danger of him being impeached with his prior conviction.

The Michigan Court of Appeals found no merit in Petitioner's claim. The Court of Appeals opined that the trial court would have denied a motion to quash and that a successful motion would not have precluded the jury from hearing information about Petitioner's criminal record.

### 1. Clearly Established Federal Law

The "clearly established Federal law" for claims of ineffective assistance of counsel is Strickland v. Washington, 466 U.S. 668 (1984). Pinholster, 563 U.S. at 189. Under Strickland, a defendant must show "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." Strickland, 466 U.S. at 687. "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." Id.

The deficient-performance prong "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. "[T]he defendant must show that counsel's representation fell below an objective standard of reasonableness. Id. at 688.

The "prejudice" prong "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687. A defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. To summarize, "[c]ounsel is

unconstitutionally ineffective if his performance is both deficient, meaning his errors are 'so serious' that he no longer functions as 'counsel,' and prejudicial, meaning his errors deprive the defendant of a fair trial." Maryland v. Kulbicki, 136 S. Ct. 2, 3 (2015) (emphasis omitted).

### 2. Application

In Michigan,

> [w]hen considering a motion to quash and determining whether a defendant should have been bound over on preliminary examination, the trial court should apply a clear abuse of discretion review. People v. Irby, 129 Mich. App. 306, 342 N.W.2d 303 (1983); People v. Dyer, 157 Mich. App. 606, 608, 403 N.W.2d 84 (1986). The Court of Appeals then reviews the trial court's decision under an abuse of discretion standard. Dyer, supra; People v. Hammond, 161 Mich. App. 719, 721, 411 N.W.2d 837 (1987). The magistrate is not required to find guilt beyond a reasonable doubt, but some evidence on each element of the crime charged must be presented or evidence must be presented from which the elements on each offense can reasonably be inferred. People v. Irby, supra, pp. 321–322, 342 N.W.2d 303; People v. Kubasiak, 98 Mich. App. 529, 532, 296 N.W.2d 298 (1980). Where the testimony both supports and negates an element of the crime charged, the question is one of fact which properly should be left to the finder of fact. People v. Tait, 99 Mich. App. 19, 24, 297 N.W.2d 853 (1980).

People v. Oliver, 427 N.W.2d 898, 901 (Mich. Ct. App. 1988). "The bind-over decision itself invokes a question of state law, which is not cognizable on habeas corpus review," and "[u]nder Michigan law, any error in the sufficiency of the proofs at [the] preliminary examination is considered harmless if there is sufficient evidence to convict at trial." Redmond v. Worthinton, 878 F. Supp. 2d 822, 844 (E.D. Mich. 2012) (citing People v. Hall, 460 N.W.2d 520, 522 (Mich. 1990)).

Defense counsel objected to the bindover on all the charges. 1/14/10 Prelim. Exam. Tr. at 71-72, PageID.460-461 (Dkt. 7-5). The district court nevertheless determined that there was probable cause to believe that Petitioner had committed the offenses. Id. at 72, PageID.461.

When Petitioner raised the issue during post-conviction proceedings, the trial court stated that the jury could have inferred, rather easily, that the defendants planned the robbery; that

Petitioner knew his co-defendant was armed with a shotgun; and that Petitioner used the threat of the shotgun to make the clerk comply with his order to undress. The trial court concluded that there appeared to be sufficient evidence to support the jury's verdict and that trial counsel was not ineffective for failing to move to quash the bindover on the felon-in-possession charge. The court stated that, at worst, it was harmless error, considering the fact that there was sufficient evidence to prove Petitioner had possession of the firearm. 5/9/11 Mot. Hr'g at 10-11, PageID.482-483. Given this ruling, it is unlikely that the trial court would have granted a motion to quash the felon-in-possession charge.

Moreover, for the reasons given above in the discussion on the sufficiency of the evidence, there was sufficient evidence at trial to convict Petitioner of being a felon in possession of a firearm. Therefore, the bindover on the charge was harmless, and Petitioner was not prejudiced by his attorney's failure to file a motion to quash the felon-in-possession charge.

Finally, even though the felon-in-possession charge had the effect of informing the jury that Petitioner was a felon, the nature of the prior convictions was never divulged to the jury, and there was other evidence that Petitioner had a criminal record. Officer Esther Campbell, for example, indicated at trial that she found Petitioner's photograph in the police department's computer database. 8/19/10 Trial Tr. at 86, PageID.1428.

For all the reasons given above, Petitioner has failed to show that his trial attorney's performance was deficient and that the allegedly deficient performance prejudiced him. Therefore, his ineffective-assistance-of-counsel claim fails.

### C. Claims Five, Six, and Seven: Incorrect Scoring of Offense Variables

Petitioner's remaining three claims challenge the trial court's scoring of three offense variables of the Michigan sentencing guidelines. Habeas claim five alleges that the state court

erred when it assessed fifty points for offense variable 6, which "is the offender's intent to kill or injure another individual." Mich. Comp. Laws § 777.36(1). The sentencing judge must "score this variable consistent with a jury verdict unless the judge has information that was not presented to the jury." Mich. Comp. Laws § 777.36(2)(a). Fifty points is proper if "[t]he offender had premeditated intent to kill or the killing was committed while committing or attempting to commit . . . robbery . . . ." Mich. Comp. Laws § 777.36(1)(a).

The jury acquitted Petitioner of felony murder, i.e., murder committed during a robbery. Petitioner, therefore, argues that the trial court's score of fifty points for offense variable 6 was inconsistent with the jury's verdict.

Habeas claim six alleges that the trial deprived Petitioner of due process by assessing fifty points for offense variable 7, which is aggravated physical abuse. Mich. Comp. Laws § 777.37(1). Fifty points is appropriate if "[a] victim was treated with sadism, torture, excessive brutality or similarly egregious conduct designed to substantially increase the fear and anxiety a victim suffered <u>during the offense</u>." Mich. Comp Laws § 777.37(1)(a) (emphasis added). Petitioner contends that all the acts cited by the trial court to support its score of fifty points occurred <u>after</u>, rather than <u>during</u>, the murder and, therefore, he should not have been scored any points for offense variable 7.

Finally, in habeas claim seven, Petitioner asserts that the trial court denied him due process when scoring fifteen points for offense variable 10, which is exploitation of a vulnerable victim. Mich. Comp. Laws § 777.40(1). A court may score this offense variable at fifteen points if "[p]redatory conduct was involved." Mich. Comp. Laws § 777.40(1)(a). Petitioner contends that there were no vulnerable victims involved in the crime and there was no predatory conduct.

Petitioner's sentencing claims do not warrant relief because a challenge to the state court's application and interpretation of state sentencing guidelines is "a matter of state concern only," Howard v. White, 76 F. App'x 52, 53 (6th Cir. 2003), and "federal habeas corpus relief does not lie for errors of state law." Lewis v. Jeffers, 497 U.S. 764, 780 (1990); see also Pulley v. Harris, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ [of habeas corpus] on the basis of a perceived error of state law."). "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 68 (1991). Consequently, Petitioner's sentencing claims are not cognizable on habeas review. Tironi v. Birkett, 252 F. App'x 724, 725 (6th Cir. 2007); McPhail v. Renico, 412 F. Supp. 2d 647, 656 (E.D. Mich. 2006); Robinson v. Stegall, 157 F. Supp. 2d 802, 823 (E.D. Mich. 2001). A sentencing claim based on an alleged violation of Michigan law simply fails to state a claim on which habeas relief may be granted. Austin v. Jackson, 213 F.3d 298, 300 (6th Cir. 2000).

Furthermore, Petitioner conceded in state court that none of his scoring challenges, whether considered singularly or cumulatively, would affect the sentencing guidelines range. See Hopson, 2013 WL 3239706, at *7; Defendant-Appellant's Brief on Appeal at 25, Page ID 2688 (Dkt. 7-23). Therefore, any error in scoring the offense variables was harmless. See Williams v. United States, 503 U.S. 193, 203 (1992) (stating that, "once the court of appeals has decided that the district court misapplied the Guidelines, a remand is appropriate unless the reviewing court concludes, on the record as a whole, that the error was harmless, i.e., that the error did not affect the district court's selection of the sentence imposed."); United States v. Cramer, 777 F.3d 597, 603 (2d Cir. 2015) (stating that an error in calculating sentencing

guidelines is harmless if correcting the error would result in no change to the guidelines offense level and sentencing range).

### D. Certificate of Appealability and Leave to Proceed In Forma Pauperis on Appeal

Petitioner may not appeal the Court's denial of his habeas petition unless a district or circuit judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b)(1). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 327 (citing Slack v. McDaniel, 529 U.S. 473, 484 (2000)). When, as here, "a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack, 529 U.S. at 484.

Reasonable jurists could debate the Court's assessment of Petitioner's sufficiency-of-the-evidence claims. The Court, therefore, grants a certificate of appealability on habeas claims one through three and will allow Petitioner to proceed in forma pauperis on appeal because an appeal could be taken in good faith. 28 U.S.C. § 1915(a)(3). Reasonable jurists would not find the Court's assessment of claims four through seven debatable or wrong. Accordingly, the Court declines to grant a certificate of appealability on those claims.

### IV. CONCLUSION

For the reasons stated above, the Court denies the petition for writ of habeas corpus (Dkt. 1), grants a certificate of appealability on the sufficiency-of-the-evidence claims (one through

three), denies a certificate of appealability on claims four through seven, and grants leave to proceed in forma pauperis on appeal.

SO ORDERED.

Dated: July 12, 2018  s/Mark A. Goldsmith
     Detroit, Michigan  MARK A. GOLDSMITH
                                           United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 12, 2018.

s/Karri Sandusky
Case Manager